**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDRE TYSON, | |
|                Petitioner, | Case No. 22 C 1999 |
|    v. | Honorable Sunil R. Harjani |
| FELICIA ADKINS, Warden, | |
|                Respondent. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Andre Tyson is serving a prison term of forty-five years for first-degree murder, which includes a fifteen-year firearm enhancement. Petitioner is currently in the custody of Respondent Felicia Adkins, the warden of Danville Correctional Center.[1] Presently before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated below, the Court denies the petition and declines to issue a certificate of appealability.

---

[1] Petitioner first filed his federal habeas petition against Warden Mark Williams of the Hill Correctional Center and the Attorney General of the State of Illinois. Pursuant to Federal Rule of Civil Procedure 25, the Court orders substitution of the proper defendant, the person having custody of the person detained. Fed. R. Civ. P. 25(d); *see Bridges v. Chambers*, 425 F.3d 1048, 1049–50 (7th Cir. 2005); Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts. Since filing his petition, Petitioner has been relocated from Hill Correctional Center to Danville Correctional Center. Thus, the correct defendant is Felicia Adkins in her capacity as Warden of the Danville Correctional Center, and the Attorney General of the State of Illinois is dismissed.

## Background[2]

Following a jury trial, on November 18, 2005, Petitioner was convicted of one count of first-degree murder. This charge arose out of a fatal shooting on the morning of August 7, 2003. Petitioner, his co-defendant Leonard Brown, and other witnesses gave statements to the police shortly after the shooting and testified, to varying degrees, before the grand jury and at trial. As these statements, and the discrepancies between them, are important to the issues raised in this habeas petition, the Court will begin by restating the key facts from each.

### I.     Initial Statements to Police

In the early morning hours of August 7, 2003, 16-year-old Rashee Lewis was shot and killed at the intersection of 92nd Street and Cottage Grove Avenue. Miyako Rosenthal was at the scene around 2 a.m., where she observed a maroon Chevy Impala arrive on the scene and park directly behind her friend's car. She saw Lewis running on the sidewalk towards the Impala and that he "appeared scared." Moments later she heard approximately nine shots, then she observed the Impala run a red light at 92nd street followed by a police car. Rosenthal did not observe any weapons on or near Lewis' body.

As these events unfolded, Chicago Police Officers Lee and Valerio were patrolling the area and heard the gunshots. Unknown citizens flagged down the officers and informed them that the occupants of a maroon Impala were responsible for the shooting. Officer Lee continued down

---

[2] In reviewing a petition for federal habeas corpus, the Court must presume that the state court's factual determinations are correct unless Petitioner rebuts those facts by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Weaver v. Nicholson*, 892 F.3d 878, 881 (7th Cir. 2018). Petitioner does not challenge any of the underlying facts in his petition. The Court therefore adopts the recitation of the facts set forth in the Illinois Appellate Court's order denying Petitioner's direct appeal of his conviction, *People v. Tyson*, No. 1-06-0035 (Ill. App. Ct. Dec. 9, 2009), and the Illinois Appellate Court's order denying Petitioner's postconviction appeal, *People v. Tyson*, 2021 IL App (1st) 191500-U, 2021 WL 4941520 (Oct. 21, 2021). The facts regarding the procedural history of this case come from the petition and the state court record that Respondent provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.

Cottage Grove and observed the suspect Impala racing north bound on Cottage Grove. After losing sight of the vehicle for 30 seconds, Officer Lee reacquired visual contact with the suspect vehicle and curbed it. At that time, the only occupant was Petitioner. The officers later identified Adam Knox and Christopher Jones hiding behind a parked car.

Knox and Jones, in written statements, relayed that they left a party with Brown in his maroon Chevrolet Impala shortly before 2 a.m. on the morning of August 7, 2003, to purchase drinks at a gas station. As they were leaving the gas station, they heard gunshots that they perceived to be directed at the Impala. Brown was visibly angry and wanted to find a gun to shoot at the individual who had fired at his car. The group subsequently encountered Petitioner, and Brown relayed the details of the incident and asked Petitioner if he had a gun. Brown also told Petitioner that he knew the identity of the person or persons who fired shots at his car. Petitioner got into the passenger's seat of Brown's car and told him to drive to his house to get a gun. Petitioner entered his house and came back with a gun and a bullet proof vest.

When Petitioner got back to the car, Brown said he wanted to "do the shooting" and took the gun, put on the bullet proof vest, and moved to the back seat. Brown directed Petitioner, who was driving the Impala, to the vicinity of the gas station. As Petitioner drove down 92nd street, Lewis ran towards the side of the car and did not appear to be holding a gun or have a gun on his person. Brown yelled "there he go" and Jones observed Brown point the gun at Lewis and fire several shots. Knox heard the shots fired but as he was in the front seat, he did not turn around to see who fired them.

Petitioner drove away from the scene, but a police car soon pursued them. Petitioner attempted to evade the police by driving down an alley, at which point Brown, Knox, and Jones got out of the car.

In his videotaped statement, Brown corroborated many of these facts, but framed his actions as self-defense. Brown said that following the gas station incident, he was scared and crying, not mad. He encountered Petitioner, who he knew from grammar school, at 105th and Indiana, and explained to him what happened. Petitioner suggested they return to the scene of the shooting to "see if [they could] work it out" but first the men went to Petitioner's house and Petitioner retrieved a gun and bullet proof vest. Petitioner offered to drive, and Brown took the gun and sat in the back seat. Near the area of 92nd and Cottage Grove, Brown identified the individuals involved in the earlier incident. Petitioner drove around the block and back down the street. According to Brown, all of the individuals involved in the shooting were on the sidewalk except for Lewis, who ran towards Brown's open car window. Brown said he feared for his life and pointed the gun out the window and fired three shots at Lewis. Because it was dark, Brown could not see if Lewis had a weapon. Shortly after this, when they realized a police car was pursuing them, Petitioner drove into an alley and the three other men got out of the car. Brown was arrested later that afternoon.

Petitioner's videotaped statement also corroborated many of the details from Jones and Knox's statements and clarified his role. Petitioner explained that Brown was mad when he approached him on the night of August 7, 2003, and that Brown told him that "someone had shot at him over some females." Brown told Petitioner that he needed a gun to shoot at the people who shot at him, and that Petitioner needed to drive because Brown wanted to sit in the back of the car. When Petitioner saw Lewis running at the side of the car, he heard two gunshots and turned to see Brown firing the gun. Petitioner drove away, and accelerated when he realized the police were behind them. The other men in the car told him to stop and got out of the car, leaving the gun behind. Petitioner reached back and grabbed the gun and threw it in a vacant lot.

4

## II.     Pretrial Motions

Before the trial, Petitioner filed a motion to suppress any and all oral and written communications, confessions, statements, and omissions made by him to detectives.  Petitioner claimed that the detectives promised to release him if he confessed to providing Brown the gun and that if he did not confess, they would charge him with first-degree murder.  After a hearing, the trial court judge denied Petitioner's motion to suppress, and his statements were entered into evidence.

Petitioner also filed a motion *in limine* to exclude three prior felony convictions for possession of a controlled substance and possession of a controlled substance with an intent to deliver.  Petitioner asserted that these were immaterial.  The State sought to introduce them for credibility purposes.  The trial judge reserved judgment on the motion until after Petitioner testified, ruling that he needed to hear Petitioner's testimony before deciding.

## III.     Trial and Post-Trial Proceedings

At trial, the State called Rosenthal as its second witness.  Her testimony varied on some points from what she told detectives following the shooting.  Defense counsel impeached Rosenthal on her statement at trial that her friend's car was parked on Cottage Grove, as opposed to her statement to detectives that they were proceeding eastbound on 92nd street.

The State also called Knox and Jones, whose statements about the shooting were at times inconsistent with what they told detectives and what they testified to the grand jury.  At trial, Jones testified that Brown fired his gun upwards and not at Lewis, which contradicted his statements to detectives and the grand jury that he fired at Lewis.  When asked about the discrepancy, Jones said he had a brain tumor that affected his mental ability at the time he gave his previous statements.  Knox testified that Brown never told Petitioner why he needed a gun, contradicting his statements

5

to detectives and the grand jury that Brown asked for the gun to "go over there and shoot them back." Upon impeachment, Knox said he could not remember his prior statements or if Brown ever told Petitioner why he wanted the gun. At trial, Knox testified that Brown never stated prior to shooting that he wanted to fire Petitioner's gun, but in his grand jury testimony, Knox said that Brown told them he intended to shoot the gun and that is why he wanted to sit in the back.

The State called a forensic expert, Dr. Denton, who analyzed the autopsy reports and testified that the entry and exit wounds of the bullet were consistent with Lewis running away from the car at the time he was shot. Dr. Denton testified there was no evidence of a close-range firing. On cross-examination, Dr. Denton testified that it was possible, but unlikely that the bullet that killed Lewis had ricocheted.

Petitioner was the principal defense witness at his trial and his testimony differed from his prior videotaped statement to police on several key points. Petitioner testified that Brown was crying, as opposed to angry, when he first encountered him on the morning of August 7, 2003. He also testified that Brown never explained why someone had shot at his car, although he had previously said it was "over some females." When impeached with these discrepancies, Petitioner testified that the detectives coached him on what to say before his videotaped statements. Petitioner also testified that he never went back to his house to retrieve a gun, that Brown never asked for a gun, and that he did not know Brown had a gun until he fired shots. To explain why these statements directly contradicted his videotaped statements, where he said that he drove to his house to retrieve a gun after Brown asked for it, Petitioner again said that the detectives coached him. Petitioner also testified that when they arrived at the corner of 92nd and Cottage Grove, that Lewis ran toward the car with a gun in his hand. Petitioner testified that he was afraid and accelerated. Then he heard Brown fire the gunshots from the rear of the car. Petitioner then drove

6

away from the scene. Petitioner said that although he did subsequently stop, allowing everyone else to get out, he did not do so for that purpose. This also contradicts what he said in his videotaped statement. Finally, he testified that he did not see a gun when the other passengers left, which again contradicted his prior statements. Petitioner maintained that every single word in his videotaped statements was coached by the detectives. He also testified that he directed detectives to the area where the other men exited the car, and that he "fooled" the ASA by leading the ASA to believe that Petitioner was leading them to the murder weapon.

The juries in Petitioner's and Brown's trials (simultaneous but severed) found each man guilty of first-degree murder. Petitioner's jury found that he, or someone for whom he was legally responsible, possessed a firearm while in commission of the murder.

## IV. Direct Appeal

Petitioner's direct appeal was consolidated with his co-defendant, Leonard Brown. Both Petitioner and Brown argued that they were denied effective assistance of counsel when their lawyers failed to tender an accomplice-witness instruction at trial. Petitioner, individually, also argued that: (1) the trial court erred in refusing to give an instruction on second degree murder, which was given at Brown's simultaneous but severed jury trial; (2) the trial court erred by failing to rule on petitioner's motion *in limine* regarding his prior convictions before trial; (3) the trial court erred in imposing a 15-year sentence enhancement; and (4) Petitioner's mittimus listing two first degree murder convictions should be corrected, because the case involved one victim and he was sentenced for one count of murder. The appellate court issued an order generally affirming the convictions but ruled that Petitioner's case should be remanded for the sole purpose of correcting the mittimus to reflect the proper conviction and sentence.

7

On May 4, 2009, the Illinois Supreme Court, issued an order directing that the appellate court reconsider its decision in light of *People v. Patrick*, 908 N.E.2d 1 (Ill. 2009). On May 14, 2009, the appellate court vacated its prior order and replaced it with an order concluding that the trial court's erroneous refusal to rule on Petitioner's motion *in limine* prior to him testifying was not harmless beyond a reasonable doubt, because the trial judge was aware that Petitioner was going to testify that the confession was coerced and given the probative value of Petitioner's inculpatory statement, Petitioner's trial testimony that the statement was involuntary was crucial to his defense. Doc. [21-10] at 12. Thus, the appellate court reversed the judgment of the trial court and remanded for a new trial. The State appealed and on September 30, 2009, the Illinois Supreme Court declined to hear the appeal but entered a supervisory order directing the appellate court to vacate its order and reconsider whether the refusal to rule on Petitioner's motion *in limine* was a harmless error in light of Petitioner's decision to testify. On reconsideration, the appellate court found the error to be harmless beyond a reasonable doubt because, while his testimony was crucial to his defense, given the overwhelming evidence against Petitioner, the admission of his prior convictions was not a crucial factor in the jury's determination of guilt, and affirmed Petitioner's conviction.

## V. Postconviction Proceedings

On March 2, 2011, Petitioner filed an initial *pro se* postconviction petition raising constitutional claims related to: (1) the jury instructions issued at trial, (2) the police interrogation that led to his video statement, (3) prosecutorial misconduct, and (4) the ineffective assistance of appellate counsel for failing to raise various issues. As part of his petition, he included an affidavit from Brown which stated: (1) Brown was not present and had nothing to do with the murder; (2) Brown did not obtain a handgun from Petitioner and that his prior statements were "due to [his]

mental health problems" and police coercion; and (3) he would testify to the aforementioned statements if he was called as a witness, "like [he] would have befor[e] [Tyson] went to trial but [he] was denied the opportunity by [Tyson's] trial attorney." Doc. [21-16] ¶ 27. The circuit court summarily dismissed the petition, but the appellate court remanded for further proceedings. On remand, the circuit court appointed postconviction counsel and counsel filed a supplemental petition, in support of Petitioner's *pro se* petition, that incorporated Petitioner's petition "by reference." The supplemental petition argued that Petitioner was actually innocent and that he did not give Brown a firearm on that night. Petitioner attached a second notarized affidavit from Brown in which Brown averred: (1) he told Petitioner's trial attorney before trial that he wanted to testify for Petitioner, but he was not called as a witness; (2) if called, he would have testified that Petitioner did not give him a firearm, Petitioner "did not have any information or knowledge that a crime was going to happen," and Petitioner had nothing to do with the crime that occurred; (3) his statements to police about Petitioner were forced and coerced by the police, and he did not feel well at the time; (4) at the time he made the statements, he was diagnosed with severe depression, which the detectives knew; (5) he had asked police for an attorney and was told he would be released if he said "certain things," and his trial attorney convinced him it was best to stick to the story he said at the police station; and (6) "[t]he things that [he] said about [Tyson] were untrue." Doc. [21-16] ¶ 30. On June 26, 2019, the circuit court granted the State's motion to dismiss Petitioner's claim. Petitioner timely appealed and the appellate court found that he failed to make a substantial showing of a claim of actual innocence and that his petition was properly dismissed.

## Discussion

In his writ of habeas corpus, Petitioner brings three claims before this Court: (1) that the state trial court erred in delaying ruling on his motion *in limine* to bar the use of his prior convictions for impeachment purposes until after Petitioner testified; (2) that the trial court erred in not instructing the jury on second-degree murder when Petitioner's co-defendant in a severed trial received the instruction; and (3) that his trial counsel was ineffective because of newly discovered evidence in the form of an affidavit from his co-defendant that establishes his actual innocence and would have changed the result of the trial had his co-defendant been called to testify.

### I.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") authorizes relief under 28 U.S.C. § 2254 only when the state court's decision on the merits of the petitioner's claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In the Seventh Circuit, a state court decision is "contrary to" Supreme Court precedent if it either did not apply the proper legal rule or if the decision applied the correct rule but reached the opposite result from the Supreme Court on materially indistinguishable facts. *Meyers v. Gomez*, 50 F.4th 628, 641 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1756, 215 L. Ed. 2d 653 (2023). A state court decision is "an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is 'objectively unreasonable, not merely wrong.'" *Id.* (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)). "AEDPA's standard is intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). Further, factual determinations of a state court are presumed reasonable unless a petitioner can show otherwise by clear and convincing evidence. *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004).

However, for a petitioner to even raise a claim of error in habeas, state remedies must be exhausted. *Id.* at 648. "In order to preserve a federal claim for review in a habeas proceeding, a petitioner must first present it to the state courts through one full round of review, alerting those courts as to the federal nature of the claim when he does so." *Meyers*, 50 F.4th at 646. If a petitioner fails to bring the claims in state court and the opportunity to do so has lapsed, then he has procedurally defaulted on his claims. *Lieberman v. Thomas*, 505 F.3d 665, 669 (7th Cir. 2007).

## II.    Claim One

In Claim One, Petitioner argues that the state trial court erred in delaying ruling on his motion *in limine* to bar the use of his prior convictions for impeachment purposes until after Petitioner testified. Petitioner asserts that this impinged on his right to choose whether to testify on his own behalf, because he was unable to properly weigh the risk of being impeached by his prior convictions. Respondent contends that the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

As an initial matter, Petitioner has exhausted his state court remedies on this claim. Petitioner raised this claim during his direct appeal. The state appellate court initially found that the trial court did not abuse its discretion in declining to rule on Petitioner's motion *in limine* before trial. However, the Illinois Supreme Court, issued a supervisory order directing that the appellate court reconsider its decision in light of *People v. Patrick*, 908 N.E.2d 1 (Ill. 2009). Doc. [21-9]; *People v. Tyson*, 902 N.E.2d 1080 (Ill. 2009).

In *Patrick*, the Illinois Supreme Court held that in all but the most complicated cases, a state judge has enough information before trial to weigh the probative value of admitting a defendant's prior convictions against the danger of unfair prejudice to the defendant. *Patrick*, 908 N.E.2d at 8. A trial court's failure to rule on a motion *in limine* on the admissibility of the prior

convictions when it has sufficient information to make a ruling constitutes an abuse of discretion. *Id.* at 7. In coming to this decision, the Illinois Supreme Court considered that a criminal defendant's right to testify on his own behalf is rooted in the Fifth, Sixth, and Fourteenth Amendments, along with being an important tactical decision. *Id.* at 5.

After considering the supervisory order, the appellate court vacated its prior ruling based on *Patrick*, finding that the trial court erred by refusing to rule on the Petitioner's motion *in limine* regarding the admissibility of his prior convictions, and remanded the case for a new trial. Doc. [21-10]. The State appealed to the Illinois Supreme Court, which issued a second supervisory order directing the appellate court to consider whether the trial court's failure to rule on defendant's motion *in limine* was harmless error in light of defendant's decision to testify. *People v. Tyson*, 913 N.E.2d 1062 (Ill. 2009); Doc. [21-12]. The appellate court determined that the trial court erred in delaying its ruling on the motion *in limine*, but that it was a harmless error and affirmed Petitioner's conviction. Doc. [21-1] at 21–22. The appellate court found that the evidence against Petitioner was "overwhelming" and that while his testimony may have been important to his defense, given the weight of the evidence against him, the admission of his prior convictions was not a crucial factor in the jury's determination of guilt. *Id.* at 22. The Illinois Supreme Court denied Petitioner's appeal of this ruling. Doc [21-14]; *People v. Tyson*, 938 N.E.2d 529 (Ill. 2010). Thus, Petitioner has properly presented this claim for each level of state court review.

However, Petitioner cannot show that the delayed ruling on the admissibility of his prior convictions "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Wright v. Van Patten*, 552 U.S. 120, 126 (2008). Petitioner does not identify a clearly established federal law that requires a trial judge to rule on the admissibility of a defendant's prior

convictions before trial, and the Court found none. Instead, Petitioner relies on *Rock v. Arkansas*, 483 U.S. 44, 62 (1987), where the Supreme Court held that a prohibition of hypnotically refreshed testimony interfered with the defendant's right to testify, and *Brooks v. Tennessee*, 406 U.S. 605, 613 (1972), in which the Supreme Court held that excluding a criminal defendant from testifying if he did not testify as the first witness for the defense deprived him of his constitutional rights. Neither of these cases establishes a clear federal right to have the admissibility of his prior convictions determined before trial.

To the contrary, the nearest comparable Supreme Court cases go the other way. In *Luce v. United States*, the Supreme Court held that a defendant must testify to preserve for review their claim of improper impeachment with a prior conviction, reasoning that the testimony allows a trial judge to weigh the prejudicial impact of a prior conviction without having to speculate about the substance of the defendant's testimony. 469 U.S. 38, 42–43 (1984). In *Ohler v. United States*, the Supreme Court held that a defendant who preemptively introduces evidence of a prior conviction on direct examination may not appeal on a claim that the admission of such evidence was an error. 529 U.S. 753, 760 (2000). The Supreme Court acknowledged that the defendant must make a tactical decision about whether to testify, but doing so is not "inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify." *Id.* at 759–60. Both cases emphasize that a criminal defendant must make tactical choices when deciding whether to testify. They do not establish a clear federal right for a defendant to have the admissibility of their prior convictions decided before trial by the trial judge. Further, courts in this district have repeatedly held that there is no clearly established federal law that requires a trial judge to decide whether a defendant's prior convictions are admissible before he testifies. *See Griffin v. Truitt*, 2023 WL 358782, at *8 (N.D. Ill. Jan. 23, 2023); *Taylor v.*

13

*Nicholson*, 2018 WL 4052172, at *5 (N.D. Ill. Aug. 24, 2018); *Weathersoon v. Harrington*, 2014 WL 4771853, at *10 (N.D. Ill. Sept. 24, 2014); *Rials v. Harrington*, 2013 WL 6633191, at *7 (N.D. Ill. Dec. 16, 2013). Accordingly, there is no clearly established federal law that requires a trial judge to rule on the admissibility of a prior conviction before a defendant testifies. Thus, Petitioner's habeas claim fails on the merits.

### III.  Claim Two

Claim Two concerns Petitioner's contention that the jury should have received a second-degree murder instruction, because one was given in his co-defendant's simultaneous but severed trial. Petitioner was convicted of first-degree murder under an accountability theory. At their simultaneous but severed trials, both petitioner and his co-defendant testified. Petitioner testified that when he first encountered Brown the morning of August 7, 2003, Brown was crying, and that Brown never explained why someone had fired shots at Brown's car. Doc. [21-1] at 11. At trial, Petitioner testified that he did not go to his home to retrieve a gun, that Brown never asked him for a gun, and that he did not know Brown had a gun until he fired shots. Petitioner said that when he drove to the corner of 92nd and Cottage Grove, the victim ran toward the car with a gun, and he was afraid and accelerated. At that time, he heard Brown fire shots from the backseat, and he drove away from the scene.

Petitioner asserts that the trial court erred when it refused to give a second-degree murder instruction to the jury, despite giving one for his co-defendant, Leonard Brown. Petitioner raised this claim on his direct appeal and it was rejected by the state courts, and thus procedurally exhausted. Respondent argues that this is a non-cognizable federal claim because a state court's error in instructing the jury does not generally present a question of federal law.

During the direct appeal, the appellate court found that under a theory of accountability, a person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Doc. [21-7] at 20 (citing 720 ILCS 5/5-2(c) (2006)). The court went on to note that under Illinois law: "A person who is legally accountable for the conduct of another which is an element of an offense may be convicted upon proof that the offense was committed and that he was so accountable, although the other person claimed to have committed the offense has not been prosecuted or convicted, or has been convicted of a different offense or degree of offense, or is not amenable to justice, or has been acquitted." *Id.* (citing 720 ILCS 5/5-3 (2006). The appellate court concluded that Illinois law allowed for such an "anomaly" in the jury instructions and that Petitioner's jury found evidence beyond a reasonable doubt that a first-degree murder was committed, and that Petitioner was accountable for the crime.

The general rule is that the failure of the state trial court to instruct the jury on a lesser offense does not implicate a federal constitutional question and will not be considered in a federal habeas corpus proceeding. *Reeves v. Battles*, 272 F.3d 918, 920 (7th Cir. 2001) (citing *United States ex rel. Peery v. Sielaff*, 615 F.2d 402, 404 (7th Cir. 1979)). "In noncapital cases, failure to charge a lesser included offense will be found to violate due process 'only when the error is so fundamental a defect as to cause a fundamental miscarriage of justice.'" *Charlton v. Davis*, 439 F.3d 369, 375 (7th Cir. 2006) (quoting *Robertson v. Hanks*, 140 F.3d 707, 710 (7th Cir. 1998)). However, courts will consider whether the omission of an instruction regarding a particular offense implicated a defendant's Sixth and Fourteenth Amendment rights. *Reeves*, 272 F.3d at 920. The question for the federal court in a habeas action is not "whether the failure to instruct on a lesser

15

included offense was correct or incorrect under state law, but rather whether failure to do so constituted a defect so fundamental that it results in a complete miscarriage of justice or omission inconsistent with the standards of fair procedure." *Id.* The Petitioner's burden when bringing this claim is "especially heavy" because "an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

To support his argument, Petitioner only points to Illinois state law cases. However, under Section 2254(d)(1), the Court is to review the state court's application of federal law, not state law. Errors of state law are beyond the scope of federal habeas review where "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). This Court may not reconsider the Illinois appellate court's determination of state law issues, and Petitioner fails to point to any constitutional defect in the trial court's refusal to give the requested instruction, nor does his claim clearly implicate his right to a fair trial.

Petitioner's main contention is that it is unfair that his co-defendant, who fired the gun, received a second-degree murder instruction, when he did not. But Brown was tried separately from Petitioner, and Petitioner was charge under an accountability theory for Brown's conduct. At his trial, Brown took the stand in his own defense, where he said he acted in self-defense, which was consistent with how he characterized his conduct to detectives the day of the shooting. Under Illinois law, second degree murder is when a person commits first-degree murder but either at the time of the killing he: (1) was acting under a sudden and intense passion resulting from serious provocation, or (2) believed the circumstances to be such that, if they existed, would justify or exonerate the killing. 720 ILCS 5/9-2(a). The trial judge found there was some mitigating evidence

16

to warrant the lesser-included offense in Brown's trial and gave a second-degree murder instruction.[3]  However, Petitioner's testimony at trial was that he did not know Brown had a gun and he did not give the gun to Brown.  "A trial court does not err in refusing to tender an instruction unsupported by sufficient evidence." *Reeves*, 272 F.3d at 920.  Petitioner points to no evidence in the record that supports a jury instruction of second-degree murder given his testimony that he had no knowledge of a gun.  The fact that Petitioner did not get a second-degree murder instruction when his co-defendant did, is not a defect so fundamental that it results in a complete miscarriage of justice.

This Court may not overturn the Illinois appellate court's determination of state law issues, and Petitioner fails to point to any constitutional defect in the trial court's refusal to give the requested instruction, nor does his claim clearly implicate his right to a fair trial.  Accordingly, Petitioner was not constitutionally entitled to a second-degree murder instruction.  Therefore, Petitioner's claim is not cognizable on federal habeas review.

## IV.    Claim Three

Lastly, in Claim Three Petitioner asserts that his trial counsel was ineffective because newly discovered evidence—an affidavit from his co-defendant—establishes that he is actually innocent and had his co-defendant testified it would have changed the result of the trial.  Respondent argues that this claim is procedurally defaulted because, unlike the prior two claims, Petitioner failed to present this claim for a complete round of state court review.

"Before seeking habeas relief, a petitioner must fairly present his federal claims at each level of the state's courts for their review." *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).  A review of Petitioner's state court claims shows that he did not raise the issue of *ineffective*

---

[3] Moreover, although Brown's jury was given a second-degree murder jury instruction, Brown was found guilty of first-degree murder for this conduct.

17

*assistance of counsel* based on not calling his co-defendant or based on this affidavit. Instead, the petitioner raised a separate claim of *actual innocence* as a result of his co-defendant's affidavit. Illinois law recognizes a freestanding claim of actual innocence, but raising a claim of actual innocence in Illinois state courts is not viewed as exhausting other federal claims in a habeas petition based on the same evidence, unless the federal claim was also raised to the state court. *See Meyers*, 50 F.4th at 646–47 (finding that the petitioner did not raise a federal *Napue* claim that the prosecution was knowingly using perjured testimony when he raised the recantation as a basis for an actual innocence claim in Illinois state court). While Petitioner raised other ineffective assistance of counsel claims, he did not assert this specific claim at any level of state review. Doc. [21-1] at 2; Doc. [21-16] ¶¶ 27, 29; Doc. [21-17] at 41. As such, his claim is procedurally defaulted.

A federal court may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). The fundamental miscarriage of justice exception applies only in the "extremely rare" and "extraordinary case" where the petitioner is actually innocent of the crime for which he is imprisoned. *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Claims of actual innocence are "rarely successful." *Id.* at 324.

Although Petitioner never directly addresses the procedural bar, he alleges that his co-defendant's affidavit establishes that he is actually innocent of the crime, which the Court will construe liberally as an argument that a failure to consider his claim will result in a fundamental miscarriage of justice. But merely arguing that he is actually innocent is insufficient to overcome the procedural bar. *Coleman v. Hardy*, 628 F.3d 314, 318–19 (7th Cir. 2010), *as amended on denial*

*of reh'g and reh'g en banc* (Feb. 7, 2011) (citing *Schlup*, 513 U.S. at 315).  Petitioner must establish that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327.  When deciding the ultimate question of innocence, the court "must consider all the evidence, old and new, incriminating and exculpatory" and then "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House v. Bell*, 547 U.S. 518, 538 (2006) (cleaned up).

Petitioner cannot meet this heavy burden.  In support of his actual innocence claim, Petitioner puts forth two pieces of new evidence.  First, he points to his co-defendant's affidavit, which states that the Petitioner did not provide Brown with the gun and that Petitioner had no idea a crime was going to happen.  The affidavit further states that Brown told Petitioner's counsel that he wanted to testify on Petitioner's behalf.  Second, Petitioner asserts that an affidavit from his mother establishes that his trial counsel told her that he was going to call Brown as a witness to directly contradict the State's evidence.

When considering all the evidence, both old and new, Petitioner fails to establish that no reasonable juror would have convicted him in light of the new evidence.  First, the affidavit from Brown is contradicted by Brown's prior statements.  In his first affidavit, Brown stated that he was not present at the scene and had nothing to do with the shooting, and that he did not receive a handgun from Petitioner. Doc [21-16] ¶ 43.  In his second affidavit, he stated that Petitioner did not give him a handgun, Petitioner did not know a crime was going to occur, and that he had nothing to do with the crime. *Id.*  As the post-conviction appellate court noted, it is unclear how Brown could know that Petitioner had nothing to do with the crime if he was simultaneously claiming that he himself was not there.  Further, these statements conflict with his initial statements to police.  In his initial statements, Brown told officers that he had spoken to Petitioner, that they

went to Petitioner's house, that Petitioner retrieved a handgun and bulletproof vest and offered to drive them back to the area. Doc [21-1] at 6–7. Brown took the gun from Petitioner, and while Petitioner was driving around the block, Brown identified the individuals from the prior event. Brown then saw the victim running towards the car and was fearful for his life; then he pointed the gun out of the car window and fired three shots at the victim.

These inconsistent statements, when considered with the overwhelming evidence of Petitioner's guilt—including his own statements, the statements from the other men in the car, and the witness statements[4]—fail to establish that no reasonable juror would convict him of the crime. Further, it is unlikely that the jury would be persuaded by statements from Petitioner's mother, as her relationship to him suggests she has a strong motivation to give evidence in his favor. *See Schwartz*, 589 F.3d at 377 (finding that affidavits from the petitioner's family members years after the murder were not enough to rebut the presumption of guilt). As a result, Petitioner's procedural default is not excused and this Court cannot consider the merits of his claim.

Lastly, in his Reply brief, Petitioner asserts two additional ineffective assistance of counsel claims for the first time in federal court. Petitioner argues that his trial counsel was ineffective because he conceded to Petitioner's guilt during his opening statement and that his appellate counsel was ineffective for failing to raise the issue of trial counsel's concession of guilt. However,

---

[4] The State called Miyako Rosenthal who witnessed the shooting. She observed the maroon Chevy Impala with four individuals drive up beside her friend's vehicle and Lewis running on the sidewalk towards the Impala. Doc. [21-16] ¶ 5. She said Lewis "appeared scared." She then heard approximately nine shots and saw a handgun being fired out the back window of the Impala. She saw the Impala drive away, run a red light, and a police car began pursuing it. Rosenthal then exited her vehicle and saw Lewis lying in the street in a pool of blood, and she did not see any weapons on or near Lewis' body. The State also called Dr. John School Denton who testified that the entry and exit wounds were consistent with Lewis running away from the car when he was shot. *Id.* ¶ 16. ASA Michael Clarke, who presented both Knox and Jones to the grand jury, testified that he did not tell Knox what to say before the grand jury. *Id.* ¶ 15. In rebuttal, Detective Lazzara testified that he did not tell Petitioner what to say after he was arrested and did not promise Petitioner he would be released. *Id.* ¶ 25.

these arguments are waived because they were raised for the first time in Petitioner's Reply brief. *See United States v. Matchopatow*, 259 F.3d 847, 851 (7th Cir. 2001) ("It is well recognized that arguments not raised in the proceeding until the reply brief are waived."); *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992) (finding that arguments raised for the first time in a reply brief are waived); *Banks v. Atchison*, 839 F. Supp. 2d 1019, 1028 (N.D. Ill. 2012) (court declined to address claims raised for the first time in a *pro se* prisoner's reply brief to a habeas petition); *Melecio v. Hinthorne*, 2020 WL 7183742, at *3 n.7 (N.D. Ill. Dec. 7, 2020) (same).

### V.    Certificate of Appealability

As a final matter, pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court must either issue or deny a certificate of appealability.  To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (cleaned up).  As explained above, Petitioner's claims are procedurally defaulted or otherwise without merit under AEDPA standards.  Nothing before the Court suggests that reasonable jurists would debate the outcome of the petition or find a reason to encourage Petitioner to proceed further.  Accordingly, the Court declines to issue him a certificate of appealability.

### Conclusion

For these reasons, Petitioner's writ of habeas corpus pursuant to 28 U.S.C. § 2254 [1] is denied.  The Clerk of the Court is directed to substitute Felicia Adkins in her capacity as warden of Danville Correctional Center as Respondent and dismiss the Attorney General of the State of

Illinois and Warden Mark Williams.   Judgment shall enter in favor of Respondent and against

Petitioner.


**SO ORDERED.**

Dated:  August 22, 2024

_____
Sunil R. Harjani
United States District Judge